IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Leonwood Piner, | ) | C/A No.: 1:17-317-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.      Relevant Background

A.      Procedural History

On November 14, 2013, Plaintiff filed an application for DIB in which he alleged his disability began on September 27, 2013. Tr. at 161–65. His application was denied initially and upon reconsideration. Tr. at 109–12 and 114–15. On September 14, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Julie Petri. Tr. at 37–73 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 8, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 13–36. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 3–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 2, 2017. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 42. He completed high school. Tr. at 270. His past relevant work ("PRW") was as a building maintenance repairer and an electrician. Tr. at 68. He alleges he has been unable to work since March 31, 2014.[2] Tr. at 270.

---

[2] His attorney moved to amend Plaintiff's alleged onset date during the hearing, and the ALJ granted the motion. Tr. at 41–42.

2.     Medical History

a.     Evidence Before ALJ

In October 2012, Plaintiff was hospitalized for diverticulitis with perforation that progressed to abscess formation. Tr. at 303 and 305. After being released from the hospital, he experienced persistent drainage and developed a colocutaneous fistula. Tr. at 305. He subsequently underwent sigmoid colectomy on April 25, 2013. Tr. at 281–90.

After the colectomy, Plaintiff continued to complain of right quadrant pain, nausea, occasional emesis, and diarrhea. Tr. at 311–17. On July 25, 2013, Daniel M. Jacques, M.D. ("Dr. Jacques"), informed Plaintiff that a hepatobiliary scan showed an abnormal gallbladder. Tr. at 312. He discussed the options with Plaintiff, and Plaintiff elected to proceed with laparoscopic cholecystectomy, which he underwent on July 31, 2013. Tr. at 312 and 500–01.

On August 15, 2013, Plaintiff reported feeling "really good" for the first three days following the surgery, but having subsequently developed an acidic feeling in his throat, generalized malaise, numbness in his lips, morning diarrhea, and left-sided abdominal pain. Tr. at 309. Dr. Jacques noted that Plaintiff's blood pressure medication had been changed because of problems with hypotension and that he had been taking Prozac for three weeks for anxiety. *Id.* He observed Plaintiff to have diffuse mild abdominal tenderness and moderate residual periumbilical regional tenderness. *Id.* He indicated he did not believe Plaintiff's flu-like symptoms were indicative of surgical complications. Tr. at 310. He diagnosed chronic cholecystitis and prescribed Zofran. Tr. at 309.

Plaintiff initiated B12 injections on August 20, 2013, and continued to receive the injections on a monthly basis throughout the relevant period. Tr. at 391.

On September 12, 2013, Plaintiff presented to Jeffrey Smith, M.D. ("Dr. Smith), and Joseph Friddle, P.A. ("Mr. Friddle"), for management of mixed mood and anxiety. Tr. at 465–67. He reported a lengthy history of anxiety that had worsened over the prior 12-month period. Tr. at 465. He complained of feeling anxious, jittery, restless, on edge, unable to relax, overwhelmed, easily angered, and irritable. *Id.* He endorsed panic attacks, sleep disturbance, and impaired concentration. *Id.* Dr. Smith and Mr. Friddle diagnosed mood disorder, not otherwise specified ("NOS") and anxiety disorder, NOS. Tr. at 466. They continued Plaintiff's prescriptions for Viibryd and Clonidine, increased his dose of Ativan, discontinued Metoprolol, and prescribed a trial of Propranolol. *Id.*

Plaintiff was admitted to Bon Secours Health System on October 2, 2013, for chronic airway obstruction. Tr. at 348. His discharge summary notes diagnoses of chronic airway obstruction, hypertension, tobacco abuse, alcohol abuse, sepsis, macrocytosis, thrombocytopenia, acute kidney injury, hypokalemia, and obstructive chronic bronchitis with exacerbation. *Id.*

Plaintiff followed up with Kerri J. Houston, NP ("Ms. Houston"), at Palmetto Pulmonary and Critical Care on October 10, 2013. Tr. at 481. He reported improvement following his hospitalization, but indicated he continued to experience chest tightness and to use an Albuterol inhaler. *Id.* He complained of shortness of breath with moderate exertion, chronic productive cough, and intermittent wheezing. *Id.* He stated he felt sleepy and would take a two-hour nap each afternoon. *Id.* Ms. Houston assessed

obstructive chronic bronchitis with exacerbation, chronic obstructive pulmonary disease ("COPD"), tobacco abuse, hypertension, alcohol abuse, snoring, and daytime hypersomnolence. Tr. at 485. She referred Plaintiff for overnight oximetry. Tr. at 486.

On October 10, 2013, Plaintiff requested a different medication because Viibryd did not seem to be working. Tr. at 468. He indicated he was out of Ativan and was experiencing increased anxiety. *Id.* Mr. Friddle stopped Viibryd and prescribed Lexapro. *Id.*

Plaintiff complained that Lexapro was not working on November 6, 2013. Tr. at 470. Mr. Friddle observed Plaintiff to be tremulous and jittery and to have visible psychomotor agitation. *Id.* He prescribed Lamictal. *Id.*

On December 4, 2013, Plaintiff reported that his mood had been more stable and that he was sleeping well since starting Lamictal. Tr. at 472. He indicated his panic attacks had decreased in frequency. *Id.* Mr. Friddle increased Plaintiff's dose of Lamictal. *Id.*

On December 12, 2013, Dr. Smith and Mr. Friddle completed a mental condition questionnaire at the request of the South Carolina Vocational Rehabilitation Department. Tr. at 368–69. They explained that Plaintiff had been treated monthly from September 12, 2013, to December 4, 2013. Tr. at 368. They indicated they had prescribed medication, but that Plaintiff had not been hospitalized during the prior year. *Id.* They described Plaintiff's compliance with treatment as "good," but indicated he remained symptomatic and that full remission was not expected. *Id.* Dr. Smith and Mr. Friddle diagnosed mood disorder, NOS and anxiety disorder, NOS. They noted Plaintiff's medications included

Lamictal, Propranolol, Ativan, and Clonidine. *Id.* They described Plaintiff as having appropriate grooming; being oriented to time, person, place, and situation; demonstrating an appropriate affect and an anxious mood; having a circumstantial thought process; showing no signs of perceptual distortions; having average cognitive ability; demonstrating mildly distractible attention/concentration; and having good memory. Tr. at 369. They opined that Plaintiff had a "good" ability to complete basic activities of daily living ("ADLs"), and "adequate" abilities to relate to others and complete simple, routine tasks. *Id.* However, they were unable to assess Plaintiff's ability to complete complex tasks. *Id.* They indicated Plaintiff was able to manage his own funds. *Id.*

On December 12, 2013, Plaintiff presented to Larry A. Berglind, M.D. ("Dr. Berglind"), after having tripped and fallen over a television and injured his back. Tr. at 375. He reported constant soreness and intermittent sharp pain in his lower back. *Id.* Plaintiff indicated that Lortab provided some relief, but that his pain returned as soon as the medication wore off. *Id.* Dr. Berglind observed Plaintiff to be tender to palpation in the sacroiliac area of his back. Tr. at 376. He also noted some tenderness and swelling in Plaintiff's lower thoracic area. Tr. at 377. Plaintiff had normal reflexes and demonstrated no motor dysfunction. *Id.* Dr. Berglind administered a B-12 injection and prescribed Bactrim and Lortab. *Id.*

An x-ray showed mild degenerative changes in Plaintiff's lower thoracic spine, but no acute findings on December 13, 2013. Tr. at 510.

On December 16, 2013, a polysomnogram showed Plaintiff to have very mild obstructive sleep apnea, severe periodic limb movement disorder with some arousal, and hypoxemia. Tr. at 524–25.

Plaintiff participated in physical therapy from January 7, 2014, to March 10, 2014. Tr. at 513–23 and 547–65.

On February 7, 2014, state agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment. Tr. at 81–83. He indicated Plaintiff could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could frequently stoop, kneel, crouch, and crawl; could occasionally climb ramps and stairs and balance; could never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards, fumes, odors, dusts, gases, and poor ventilation. *Id.*

State agency consultant Silvie Kendall, Ph.D. ("Dr. Kendall"), reviewed the record and completed a psychiatric review technique form ("PRTF") and mental RFC assessment on February 26, 2014. Tr. at 78–80 and 83–84. She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.09 for substance addiction disorders and found Plaintiff to have mild restriction of ADLs, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 78–80. She found that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; to carry out detailed

7

instructions; and to maintain attention and concentration for extended periods. Tr. at 83–84.

On March 8, 2014, Plaintiff presented to the emergency room ("ER") with depressive symptoms, after having been denied disability benefits. Tr. at 536. He endorsed a history of fleeting suicidal ideation, but denied current suicidal ideation. *Id.* The attending physician described Plaintiff as appropriately oriented and having normal speech, judgment, and insight, but indicated he was also anxious, depressed, agitated, and in distress. Tr. at 538. He determined Plaintiff did not meet the criteria for psychiatric admission. *Id.*

Dr. Berglind completed a mental questionnaire on March 24, 2014. Tr. at 592. He indicated Plaintiff suffered from mood disorder and anxiety disorder and was prescribed Citalopram. *Id.* He stated the medication had helped Plaintiff's condition. *Id.* He indicated that psychiatric care had been recommended and that Plaintiff was receiving mental health treatment. *Id.* He described Plaintiff as appropriately oriented; having a distractible thought process; demonstrating obsessive thought content; showing a worried, anxious, and angry mood and affect; demonstrating poor attention and concentration; and having adequate memory. *Id.* Dr. Berglind indicated that Plaintiff had an "obvious" work-related limitation in function due to his mental condition. *Id.* He explained that Plaintiff's exacerbating stressors included poor health with numerous hospitalizations during the prior 12-month period, financial concerns, and family issues. *Id.* He indicated Plaintiff was capable of managing his own funds. *Id.*

Plaintiff reported increased anxiety during a visit with Mr. Friddle on March 31, 2014. Tr. at 756. Mr. Friddle observed Plaintiff to have a fatigued affect and an anhedonic mood. *Id.* He indicated Plaintiff's personal hygiene was poor. *Id.* He described Plaintiff's concentration and focus as being "a bit scattered," but stated he was oriented to person, place, and time; demonstrated intact short- and long-term memory; showed average judgment, insight, and fund of knowledge; had less obsessive thought processes; and showed no signs of psychosis. *Id.* Mr. Friddle increased Plaintiff's dosages of Lamictal and Ativan. *Id.*

On April 8, 2014, state agency consultant Craig Horn, Ph.D. ("Dr. Horn"), reviewed the record and prepared a PRTF and a mental RFC assessment. Tr. at 96–97 and 101–02. He considered Listings 12.04, 12.06, and 12.09 and found that Plaintiff had mild restriction of ADLs, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 96. Dr. Horn found that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; to carry out detailed instructions; and to maintain attention and concentration for extended periods. Tr. at 101–02.

State agency medical consultant David Junker, M.D. ("Dr. Junker"), completed a physical RFC assessment on April 8, 2014. Tr. at 98–100. He found that Plaintiff was capable of performing work with the following limitations: occasionally lifting and/or carrying 50 pounds; frequently lifting and/or carrying 25 pounds; standing and/or walking for about six hours in an eight-hour workday; sitting for about six hours in an eight-hour workday; frequently stooping, kneeling, crouching, and crawling; occasionally

balancing and climbing ramps and stairs; and never climbing ladders, ropes, or scaffolds. *Id.* He stated Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. *Id.*

On May 15, 2014, Plaintiff complained that his medications were making him feel sick all the time. Tr. at 781. A review of systems was negative, and Dr. Berglind noted no abnormalities on physical examination. Tr. at 781–82. He diagnosed chronic knee pain, hypertension, depression, nocturnal hypoxemia, tobacco abuse, and nausea and prescribed Ativan, Minocycline, Phenergan, and Zofran. Tr. at 782–83.

Plaintiff presented to the ER on May 28, 2014, for abdominal pain, nausea, and vomiting. Tr. at 608. The attending physician observed Plaintiff to have moderate-to-severe tenderness in his left upper and lower extremities and to be diaphoretic. Tr. at 610. Plaintiff's CT scan showed minimal stranding around the descending colon that was possibly caused by mild colitis, hepatic steatosis, and an umbilical hernia containing fat. Tr. at 619. The attending physician prescribed Norco and advised Plaintiff to continue his other medications. Tr. at 621–22. Plaintiff was discharged on June 1, 2014. Tr. at 618–19.

Plaintiff followed up with Dr. Berglind the next day and complained of a headache. Tr. at 788. Dr. Berglind observed Plaintiff to have abdominal tenderness, but noted no other abnormalities. Tr. at 789–90. He diagnosed diverticulitis and alcohol abuse and prescribed Librium for anxiety. Tr. at 790.

Plaintiff reported feeling more anxious and being overwhelmed by financial stressors on June 5, 2014. Tr. at 754. Mr. Friddle prescribed Depakote ER and decreased Plaintiff's dosage of Lamictal. *Id.*

Plaintiff complained of knee pain and foot swelling on June 12, 2014. Tr. at 793. Dr. Berglind observed Plaintiff to have abdominal tenderness and musculoskeletal edema and tenderness, but noted no other abnormalities. Tr. at 794. He referred Plaintiff to an orthopedic surgeon and prescribed Clonidine and Hydrochlorothiazide. Tr. at 795.

On June 19, 2014, Plaintiff reported that his anxiety had improved and that he was sleeping better and feeling more relaxed. Tr. at 752. Mr. Friddle increased Plaintiff's dose of Depakote ER and continued his other medications. *Id.*

Plaintiff presented to orthopedic surgeon Stephen Ridgway, M.D. ("Dr. Ridgeway"), for left knee pain on June 23, 2014. Tr. at 606–07. He reported that his left knee was catching and giving way. Tr. at 606. He described a prior injury that had resulted in a tear to his knee. *Id.* He indicated arthroscopic surgery had been discussed at the time, but he had been unable to proceed with it because he had no insurance. *Id.* Dr. Ridgeway observed that Plaintiff had decreased flexibility in his back. Tr. at 607. An examination of Plaintiff's left knee revealed no effusion. *Id.* Plaintiff was able to fully extend the knee and to flex to more than 115 degrees. *Id.* He had some very mild patellofemoral crepitation in the flexion arc. *Id.* He demonstrated similar ROM in his right knee. *Id.* An x-ray of Plaintiff's left knee was normal. *Id.* Dr. Ridgeway diagnosed probable internal derangement of the left knee and occult meniscal tear and recommended an MRI. *Id.*

On July 8, 2014, an MRI of Plaintiff's left knee showed a small horizontal cleavage tear involving the posterior horn of the medial meniscus, irregularity of the

cartilage in all three compartments, and mild edema within the quadriceps fat pad. Tr. at 604–05. The study was somewhat limited secondary to motion. Tr. at 605.

Plaintiff presented to Jack Sizemore, PA-C ("Mr. Sizemore"), on July 11, 2014, to follow up on left knee pain and to review the MRI results. Tr. at 601–02. He reported having experienced pain, popping, locking, and intermittent swelling in the knee. Tr. at 601. He indicated he often felt as if he were going to fall. *Id.* Mr. Sizemore observed Plaintiff to have mild swelling and pain upon palpation over the medial joint line. *Id.* Plaintiff demonstrated no significant crepitance or instability. *Id.* Mr. Sizemore diagnosed a left knee medial meniscus tear with tricompartmental mild degenerative changes and recommended Plaintiff be evaluated by a specialist in sports medicine. *Id.*

Plaintiff presented to Dr. Berglind on July 14, 2014, for knee pain and medication refills. Tr. at 803. Dr. Berglind observed Plaintiff to have musculoskeletal tenderness, but noted no other abnormalities. Tr. at 804. He reviewed the MRI of Plaintiff's left knee and referred him to John R. Vann, M.D. ("Dr. Vann"), to discuss surgery. Tr. at 805.

Plaintiff presented to Dr. Vann on August 5, 2014. Tr. at 598. They discussed the risks and benefits of arthroscopic knee surgery, and Plaintiff elected to proceed with it. *Id.*

Plaintiff underwent arthroscopic medial meniscectomy, chondroplasty of the patella and medial femoral condyle, and excision of thickened hypertrophic medial synovial plica on August 22, 2014. Tr. at 599–600.

Plaintiff reported occasional pain and swelling, but indicated he was generally doing well on September 2, 2014. Tr. at 597. He had good active ROM, trace effusion,

and healing surgical wounds. *Id.* Dr. Vann recommended a strengthening program and informed Plaintiff that the surgical findings suggested he might have a prolonged or incomplete recovery. *Id.*

Plaintiff followed up with Dr. Berglind to have his pain medication refilled on September 15, 2014. Tr. at 813. He reported that he was informed of an irregular heartbeat following his surgery. *Id.* Dr. Berglind observed no abnormalities on physical examination. Tr. at 814. He prescribed Norco for pain. *Id.*

On October 22, 2014, Plaintiff reported that he had started drinking again because his sister had passed away unexpectedly and his father was very ill. Tr. at 819. He stated he had been drinking seven shots of liquor per day. *Id.* He indicated he had successfully used Librium to stop drinking five months prior and requested that Dr. Berglind prescribe the medication again. *Id.* A neurological examination was positive for tremors. Tr. at 820. Dr. Berglind agreed to prescribe Librium. Tr. at 821.

Plaintiff followed up with Mr. Friddle on November 5, 2014. Tr. at 750. He reported manageable anxiety and minimal depressive symptoms. *Id.* He indicated he was sleeping well and coping with the loss of his sister. *Id.* He stated he was no longer taking Depakote. *Id.* Mr. Friddle observed Plaintiff to have a fatigued affect and an anhedonic mood. Tr. at 750. He noted that Plaintiff smelled of smoke and had poor hygiene. *Id.* He stated Plaintiff was appropriately oriented, but noted that his concentration and focus were a bit scattered. *Id.* Mr. Friddle stated Plaintiff's thought processes were less obsessive. *Id.* He prescribed Lamictal, Ativan, and Propranolol. *Id.*

Plaintiff presented to Dr. Berglind for a blood pressure check and medication refills on December 15, 2014. Tr. at 827. Dr. Berglind noted no abnormalities on physical examination. Tr. at 828. He refilled Plaintiff's prescription for Norco, but indicated he would decrease the dosage from three to two pills per day during his next visit. Tr. at 829.

Plaintiff presented to the ER for chest pain and shortness of breath on January 23, 2015. Tr. at 654. Initial lab tests showed Plaintiff's potassium level to be above normal, and his electrocardiogram ("EKG") results to be in the borderline range. Tr. at 645 and 657. A second cardiac enzyme test revealed Plaintiff's potassium level to be normal. Tr. at 658.

Plaintiff presented to Dr. Berglind for a complete physical on January 29, 2015. Tr. at 841. He complained of cough, claudication, nausea, joint pain, weakness, depression, and memory loss. Tr. at 841–42. Dr. Berglind observed Plaintiff to have bilateral tremors, but noted no other abnormalities on physical examination. Tr. at 842–43. He offered Plaintiff detox for his alcoholism, but Plaintiff declined. Tr. at 843.

Plaintiff presented to Dr. Berglind with muscle spasms and left abdominal pain on March 4, 2015. Tr. at 849. Dr. Berglind noted that Plaintiff's muscle spasms were often associated an abnormal potassium level. *Id.* He observed Plaintiff to have abdominal tenderness, but noted no other abnormalities. Tr. at 850–51. He referred Plaintiff for lab work. Tr. at 851.

Plaintiff presented to Bon Secours Health System on March 15, 2015, for atypical chest pain with nausea. Tr. at 672. He was admitted for cardiac observation, but a stress test was negative. Tr. at 672 and 682. He was discharged on March 17, 2015, with

diagnoses of acute-on-chronic renal failure, alcohol abuse, chest pressure, COPD exacerbation, snoring, tobacco abuse, nocturnal hypoxemia, and gastroesophageal reflux disease ("GERD"). Tr. at 671.

On March 24, 2015, Plaintiff reported doing well since his hospital discharge. Tr. at 856. He indicated he had been unable to afford Symbicort or Advair, but expected he would soon be able to obtain them. *Id.* Dr. Berglind noted that Plaintiff had been diagnosed with Barrett's esophagitis. *Id.* He observed no abnormalities on physical examination. Tr. at 857. He strongly urged Plaintiff to quit smoking and discussed his medications and side effects. Tr. at 858.

Plaintiff reported mild nausea, poor appetite, and "constant soreness" in his left upper abdominal quadrant on March 30, 2015. Tr. at 861. Dr. Berglind observed Plaintiff to have abdominal tenderness and rebound. Tr. at 862. He discussed diet, exercise, and weight control and ordered blood work. Tr. at 863.

On May 6, 2015, Plaintiff reported that his depression had increased in recent months. Tr. at 748. He indicated his anxiety had generally been more manageable on Depakote and that he was sleeping well, but he also endorsed panic attacks. *Id.* Mr. Friddle described Plaintiff as demonstrating poor hygiene and having a fatigued affect and an anhedonic mood. *Id.* He stated Plaintiff was not tremulous or jittery. *Id.* He indicated Plaintiff was appropriately oriented and had less obsessive thought processes. *Id.* However, he noted Plaintiff's concentration and focus were a bit scattered. *Id.* He continued Plaintiff on Depakote, Lamictal, Ativan, and Propranolol. *Id.*

Plaintiff presented to nephrologist Frederick Rogoff, M.D., on June 16, 2015, for an evaluation of renal insufficiency. Tr. at 903. Dr. Rogoff noted that Plaintiff had a greater than 10-year history of hypertension and had reported occasional edema. *Id.* He noted no significant abnormalities on physical examination. Tr. at 905. Dr. Rogoff ordered diagnostic testing and indicated that Plaintiff's abnormal kidney function could be related to nephrosclerosis or to use of nonsteroidal agents. Tr. at 906. He noted that Plaintiff was not using a continuous positive airway pressure ("CPAP") machine and explained that its use would likely improve his blood pressure. *Id.* He encouraged Plaintiff to discontinue smoking and alcohol abuse to better regulate his blood pressure. *Id.*

A renal ultrasound was unremarkable and showed no hydronephrosis on June 25, 2015. Tr. at 907.

On July 22, 2015, Dr. Rogoff informed Plaintiff that laboratory tests and the renal ultrasound had been unremarkable. Tr. at 900. Plaintiff's blood pressure was elevated at 167/105 mm/Hg. Tr. at 901. Dr. Rogoff diagnosed abnormal kidney function and hypertension, prescribed Apresoline, and ordered additional diagnostic testing. Tr. at 902.

On August 5, 2015, Plaintiff presented to Linda Giambalvo, M.D. ("Dr. Giambalvo"), for problems with his gums and bilateral flank pain. Tr. at 872. Ms. Giambalvo observed Plaintiff to have broken and missing teeth, inflamed gums, and mild bilateral flank tenderness. Tr. at 875–76. She prescribed Norco, Albuterol, and Amoxicillin, ordered blood work, and advised Plaintiff to stop smoking. Tr. at 876.

Plaintiff presented to Jennifer Edwards, NP ("Ms. Edwards"), on August 6, 2015. Tr. at 887. He reported that Dr. Rogoff had prescribed Hydralazine for hypertension, but indicated he had not filled the medication because the pharmacist cautioned him against it. *Id.* Ms. Edwards observed Plaintiff's blood pressure to be elevated at 160/100 mm/Hg. She advised Plaintiff to start Hydralazine and to maintain a log of his blood pressure readings. Tr. at 891. Plaintiff requested that Norco be refilled early, but Ms. Edwards declined his request and instructed him to follow up in a week. Tr. at 887.

Plaintiff reported that he felt more anxious on August 18, 2015. Tr. at 754. He endorsed symptoms that included anxiety, depression, feelings of stress, personality change, difficulty concentrating, and sleep disturbance. *Id.* Mr. Friddle described Plaintiff as having a fatigued affect; an anhedonic mood; poor hygiene; appropriate orientation; slightly scattered concentration and focus; intact memory; and average judgment and insight. *Id.* He prescribed Depakote, decreased Plaintiff's dose of Lamictal, and continued him on Ativan, Propranolol, and Clonidine. *Id.*

On August 21, 2015, Plaintiff reported that he was doing better at home and exercising regularly. Tr. at 894. He indicated his neuropathy had been a little worse. *Id.* Dr. Giambalvo observed Plaintiff to have tenderness in his left lower abdominal quadrant. Tr. at 897. She prescribed Zofran and Flagyl for diverticulitis and administered a vitamin B12 injection. Tr. at 898.

b.      Evidence Submitted to Appeals Council

On November 2, 2015, Dr. Smith and Mr. Friddle completed a form that addressed Plaintiff's mental ability to do work-related activities. Tr. at 915–16. They indicated

Plaintiff had poor or no ability to relate to coworkers; deal with the public; interact with supervisors; deal with work stresses; maintain attention and concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; maintain personal appearance; behave in an emotionally-stable manner; relate predictably in social situations; and demonstrate reliability. *Id.* They stated Plaintiff had fair abilities to use judgment; function independently; and understand, remember, and carry out simple instructions. *Id.* They indicated Plaintiff had a good ability to follow work rules. Tr. at 915. They specified the following with respect to Plaintiff's limitations and the findings that supported such limitations:

> Unable to cope w/ normal stress appropriately. Unable to be punctual or reliable. Unable to perform organized job tasks accurately and efficiently. Unable to deal w/ co-workers and general public in a[n] emotionally stable manner.

*Id.* They further indicated as follows:

> The severity of his anxiety and emotional lability significantly impairs his cognition and cognitive processing. As a result, he is very easily distracted, unorganized, and may have difficulty performing a complex job.

Tr. at 716. They opined that Plaintiff had been limited as described in the assessment since September 12, 2013. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on September 14, 2015, Plaintiff testified that he last worked on October 1, 2013. Tr. at 46. He stated his employer eliminated his job as a maintenance supervisor because he was unable to meet the job's physical requirements. *Id.* He indicated he had difficulty lifting, remained in constant pain, and required lengthy bathroom breaks. Tr. at 46–47.

Plaintiff testified that he would have to work in close proximity to a bathroom and would be unable to complete a workday because of bowel problems. Tr. at 51. He indicated he could not predict when he would need to use the restroom or how long it would take him. *Id.* He stated he experienced abdominal swelling and bloating. Tr. at 53.

Plaintiff endorsed pain in his abdomen, knees, and feet. Tr. at 54. He indicated he had difficulty standing and sometimes felt as if he were going to fall. Tr. at 54 and 55. He stated he had not followed up with the orthopedic surgeon for his knee pain and instability because he had an outstanding account balance. Tr. at 54. He reported he had participated in physical therapy for back problems, but had been unable to continue it because he lacked insurance. Tr. at 55–56.

Plaintiff testified that his COPD was generally well-controlled, but noted that he had experienced an exacerbation that had required a three-day hospitalization. Tr. at 56. He indicated he had visited a nephrologist for kidney problems, but had yet to follow up. Tr. at 56–57. He stated his kidney problems caused his back to feel sore. Tr. at 57. He

endorsed symptoms of depression and anxiety that were exacerbated by his financial problems and inability to work. Tr. at 58. He indicated he had received some benefit from psychiatric care and was no longer experiencing prolonged crying spells. Tr. at 64.

Plaintiff testified that he took Norco for pain. Tr. at 53. He indicated the medication made the pain more subtle, but did not eliminate it. *Id.* He reported his medications caused side effects that included lightheadedness, dizziness, nausea, and a hand tremor. Tr. at 64.

Plaintiff testified that he had difficulty lifting a gallon of milk and would be unable to lift any substantial weight for more than a minute or two because it would strain his abdomen. Tr. at 59. He stated he walked 150 feet to his mailbox each day. Tr. at 61. He indicated he was able to climb stairs, but tried to avoid doing it more than three times per day because of fatigue. Tr. at 62.

Plaintiff admitted that he continued to consume alcohol, but no longer drank to excess. Tr. at 48. He stated he had previously consumed more alcohol, but had obtained medication from his doctor that helped him to stop drinking. *Id.* He testified that he resumed use of alcohol to excess after his sister passed away. *Id.* He indicated he returned to his doctor for medication a second time and had been successful in reducing his alcohol use to four or five drinks on a couple of days per week. Tr. at 49. He stated he had reduced his cigarette consumption from three to two packs per day. Tr. at 50.

Plaintiff testified that had a driver's license, but no longer drove because of panic attacks. Tr. at 45. He denied taking out the trash and doing the laundry, but indicated he attempted to assist with household chores. Tr. at 59–60. He stated he would occasionally

visit stores, but did not like to leave his house. Tr. at 60. He indicated he spent most of his time sitting or lying down. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 67–71. The VE categorized Plaintiff's PRW as a building maintenance repairer, *Dictionary of Occupational Titles* ("*DOT*") number 899.381-010, as requiring medium exertion and having a specific vocational preparation ("SVP") of seven and an electrician, *DOT* number 824.261-010, as requiring medium exertion and having an SVP of seven. Tr. at 68. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required no climbing of ladders, ropes, or scaffolds; and occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling. *Id.* She further indicated the individual should avoid concentrated exposure to excessive vibration, fumes, odors, dusts, gases, moving machinery, and unprotected heights and would be limited to simple, routine tasks. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs that the hypothetical person could perform. Tr. at 69. The VE indicated that "simple, routine, repetitive tasks of course described unskilled jobs" and that the individual would be limited to light jobs with an SVP of two as a small parts assembler, *DOT* number 706.684-022, with 840,000 positions in the national economy; an electrical assembler, *DOT* number 729.687-010,

with 154,000 positions in the national economy; and a capacitor assembler, *DOT* number 729.687-010, with 91,000 positions in the national economy.[3] *Id.*

For a second hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, but was further limited to work at the sedentary exertional level. *Id.* She asked if there would be jobs available. *Id.* The VE identified sedentary jobs with an SVP of two as an assembler, *DOT* number 734.687-018, with 350,000 positions in the national economy; a bench hand worker, *DOT* number 715.684-026, with 84,000 positions in the national economy; and a weight tester, *DOT* number 539.485-018, with 84,000 positions in the national economy. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who would be absent from work approximately three times per month. Tr. at 70. She asked if there would be any jobs available. *Id.* The VE indicated there would be no jobs because three absences would be considered excessive. *Id.*

For a fourth hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who would be off task for approximately eight percent of the workday. *Id.* The VE indicated eight percent of the workday would most closely equate to 30 minutes of time off-task in addition to breaks

---

[3] The VE erroneously cited the same *DOT* number for electrical assemblers and capacitor assemblers. *See* Tr. at 69. The correct *DOT* number for capacitor assemblers is 729.684-014.

and would be on the borderline for acceptable amount of time off-task. *Id.* He indicated

that any longer period of time off-task would be considered unacceptable. *Id.*

For a fifth hypothetical question, the ALJ asked the VE to consider a hypothetical

individual who would be off-task for 20 percent of the workday. *Id.* The VE indicated all

full-time work would be precluded. *Id.*

For a sixth hypothetical question, the ALJ asked the VE to consider an individual

who would be unable to sustain an eight-hour workday on a continuing basis. Tr. at 70–

71. The VE testified that there would be no jobs for such an individual. Tr. at 71.

## 2. The ALJ's Findings

In her decision dated October 14, 2015, the ALJ made the following findings of

fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.
2. The claimant has not engaged in substantial gainful activity since March 31, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: meniscal tear/ chondromalacia of the left knee status post arthroscopy, chronic obstructive pulmonary disease (COPD), mood disorder and anxiety disorder (20 CFR 404.1520(c)).
4. The claimant also has the following non-severe impairments: hypertension, obstructive sleep apnea, status post gall bladder removal and colectomy, history of alcohol use, stage 3 chronic kidney disease, vitamin B12 deficiency (20 CFR 404.1521 and 416.921).
5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). In particular, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently. He can stand or walk for approximately 6 hours of an 8-hour workday and sit for

approximately 6 hours of an 8-hour workday with normal breaks. The claimant can never climb ladders, ropes or scaffolds, but occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He must avoid concentrated exposure to excessive vibration; irritants such as fumes, odors, dusts, gases; and hazards, such as moving machinery and exposure to unprotected heights. The claimant is limited to work with simple, routine tasks.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on October 17, 1966 and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2014, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 18–31.

II. Discussion

Plaintiff alleges the Commissioner erred because the ALJ failed to identify and resolve a conflict between the VE's testimony and the jobs described in the *DOT*. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ erred in relying on the VE's testimony without resolving a potential conflict between it and the job descriptions in the *DOT*. [ECF No. 10 at 16]. She maintains the *DOT* describes the jobs the VE identified as having General Educational Development ("GED") reasoning levels of two and three. *Id.* at 20–21.

The Commissioner contends that the ALJ properly relied on the VE's testimony to find that Plaintiff was capable of performing unskilled jobs in the national economy. [ECF No. 11 at 8]. She maintains that the VE explained that a restriction to simple, routine, repetitive tasks was consistent with performance of unskilled jobs. *Id.* She further counters that the RFC assessment in the instant case differs from that found to conflict with the *DOT*'s description in *Henderson v. Colvin*, 643 F. App'x 273 (4th Cir. 2016), because the ALJ did not limit Plaintiff to one-to-two step instructions. *Id.* at 10.

"[T]he Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). In assessing the claimant's ability to perform specific jobs, the ALJ should take administrative notice of the information contained in the *DOT*. 20 C.F.R. § 404.1566(d); *see also* SSR 00-4p (providing that "we rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). In some cases,

28

ALJs obtain testimony from VEs to address how certain restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. § 404.1566(e).

The SSA promulgated SSR 00-4p to explain how conflicts between VEs' opinions and the information in the *DOT* should be resolved. The Fourth Circuit has explained that the "purpose" of SSR 00-4p "is to require the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson*, 810 F.3d at 208, citing SSR 00-4p (emphasis in original). The court noted that SSR 00-4p sets forth two independent responsibilities. *Id.* "First, the ALJ must '[a]sk the [vocational expert] . . . if the evidence he or she has provided conflicts with the information provided in the [*Dictionary*]'; and second, '[i]f the [vocational expert]'s . . . evidence appears to conflict with the [*Dictionary*],' the ALJ must 'obtain a reasonable explanation for the apparent conflict.[6]'" *Id.* at 208, citing SSR 00-4p. "SSR 00-4p directs the ALJ to 'resolve the conflict by determining if the explanation given by the [expert] is reasonable'" and "to 'explain the resolution of the conflict *irrespective of how the conflict was identified*.'" *Id.* at 208, citing SSR 00-4p (emphasis in original). Thus, "[t]he ALJ independently must identify conflicts between the expert's testimony and the *Dictionary*." *Id.* at 209. Furthermore, "an ALJ has not fully developed the record if it contains an unresolved conflict between the VE's testimony and the *DOT*" and "an ALJ errs if he ignores an

---

[6] The court explained that an "apparent conflict" existed when the VE's evidence "appear[ed] to conflict with the *Dictionary*." *Pearson*, 810 F.3d at 209.

apparent conflict on the basis that the VE testified that no conflict existed." *Henderson*, 643 F. App'x at 277, citing *Pearson*, 810 F.3d at 210.

Pertinent to Plaintiff's argument, the ALJ found that Plaintiff had the RFC to perform simple, routine tasks. Tr. at 22. He relied on the VE's testimony to determine that Plaintiff was capable of performing jobs as a small parts assembler, an electrical assembler, and a capacitor assembler. Tr. at 30. The ALJ received confirmation from the VE that his testimony was consistent with the *DOT* (Tr. at 71), and indicated in the decision that the two were consistent (Tr. at 30). However, a review of the *DOT* reveals that the identified jobs have GED reasoning levels of two and three. *See* 706.684-022, ASSEMBLER, SMALL PRODUCTS I. *DOT* (4th ed., revised 1991), 1991 WL 679050 ("Reasoning: Level 2"); 729.687-010, ASSEMBLER, ELECTRICAL ACCESSORIES I. *DOT* (4th ed., revised 1991), 1991 WL 679733 ("Reasoning: Level 2"); 729.684-014, CAPACITOR ASSEMBLER. *DOT* (4th ed., revised 1991), 1991 WL 679719 ("Reasoning: Level 3").

The Commissioner cites *McCollough v. Colvin*, No. 4:14-1362-DCN (D.S.C. Aug. 11, 2015), as noting a split among the district courts within the Fourth Circuit as to whether jobs with a GED reasoning level of two conflict with a restriction to simple, routine, and repetitive tasks. [ECF No. 11 at 11]. She contends that "a majority of district courts within the Fourth Circuit who have considered the *DOT*'s reasoning level descriptions, [have] repeatedly found no conflict between an RFC for simple, routine, repetitive work involving [a] reasoning level of 2" and cites several cases to support her conclusion. *Id.* at 11–12, citing *Gable v. Colvin*, No. 9:14-2820-BHH, 2015 WL

5604176, at *17–18 (D.S.C. Sept. 22, 2015); *McCullough*, 2015 WL 4757278, at *6 n.3;

*Brumm v. Colvin*, No. 7:14-78, 2015 WL 4723622, at *5–6 (E.D.N.C. Aug. 10, 2015);

*Durham v. Colvin*, No. 1:10-405, 2015 WL 457939, at *11–12 (M.D.N.C. Feb. 3, 2015);

*Pippen v. Astrue*, No. 1:09-308, 2010 WL 3656002, at *7 (W.D.N.C. Aug. 24, 2010),

adopted by 2010 WL 3655998 (W.D.N.C. Sept. 15, 2010); *Marshall v. Colvin*, No. 13-

1585, 2014 WL 6066008, at *5 (D. Md. Nov. 12, 2014); *Snider v. Colvin*, No. 7:12-539,

2014 WL 793151, at *7–8 (W.D. Va. Feb. 26, 2014). However, the decisions in the cases

the Commissioner cites were rendered prior to the Fourth Circuit's decision in

*Henderson*.

In *Henderson*, 643 F. App'x at 277, the court explained that "[u]nlike GED

reasoning Code 1, which requires the ability to '[a]pply commonsense understanding to

carry out simple one-or-two-step instructions,' GED Reasoning Code 2 requires the

employee to '[a]pply commonsense understanding to carry out detailed but uninvolved

written or oral instructions.'" *Id.*, citing *DOT*, 1991 WL 688702 (2008); *Rounds v.

Comm'r*, 807 F.3d 996, 1003 (9th Cir. 2015) (holding that reasoning code two requires

additional reasoning and understanding above the ability to complete one-to-two step

tasks). The court acknowledged that "there is an apparent conflict between an RFC that

limits [a claimant] to one-to-two step instructions and GED reasoning Code 2, which

requires the ability to understand detailed instructions." *Id.* Accordingly, the court found

that the ALJ failed to meet his burden at step five because the VE's testimony did not

provide substantial evidence to show that the plaintiff's RFC would allow him to perform

work that existed in significant numbers. *Id.* at 277; *Pearson*, 810 F.3d at 207–10.

Although *Henderson* is an unpublished opinion, this court has considered its holding in subsequent cases in which it found that ALJs failed to resolve apparent conflicts between the *DOT* and VE testimony. *See Pressley v. Berryhill*, No. 8:16-2716-BHH-JDA, 2017 WL 4174780, at *10–11 (D.S.C. Aug. 24, 2017), adopted by 2017 WL 4156460 (D.S.C. Sept. 19, 2017) (finding that an apparent conflict existed between the jobs the VE identified in response to a hypothetical question that restricted the plaintiff to simple, routine, and repetitive tasks and the *DOT*'s description of the job as having GED reasoning levels of two and three); *Dewalt-Gallman v. Berryhill*, No. 9:16-2332-PMD-BM, 2017 WL 2257418, at *4 (D.S.C. May 5, 2017), adopted by 2017 WL 2225133 (D.S.C. May 22, 2017) (determining that the ALJ failed to resolve a conflict between the VE's identification of jobs described in the *DOT* as having a GED reasoning level of three and a restriction in the RFC to "simple, routine, and repetitive tasks requiring only simple work related instructions and decisions as well as relatively few work place changes"); *Christopherson v. Colvin*, No. 6:15-4725-JMC-KFM, 2016 WL 7223283, at *9 (D.S.C. Nov. 18, 2016) (holding that an apparent conflict existed between the VE's identification of jobs having GED reasoning levels of two and three and an RFC that limited the plaintiff to "simple, routine, and repetitive tasks"); *Sullivan v. Colvin*, No. 8:16-79-JMC-JDA, 2016 WL 7228854, at *10 (D.S.C. Nov. 10, 2016) (finding that the ALJ erred in either failing to recognize or neglecting to obtain an explanation as to a conflict between an RFC for "one or two step tasks" and the VE's identification of jobs with a GED reasoning level of two).

The RFC assessment in the instant case is similar to that in *Henderson*, 643 F. App'x at 276, in that both limited the plaintiffs to simple tasks, but it differs from that in *Henderson* in that the ALJ declined to indicate how many steps Plaintiff was capable of performing. It is more akin to the RFC assessments in *Christopherson*, 2016 WL 7223283, at *8, and *Pressley*, 2017 WL 4174780, at *10–11, which limited the plaintiffs to "simple, routine, and repetitive tasks." The court's findings in these cases suggest that an apparent conflict exists between the *DOT*'s descriptions of the jobs the VE identified and the limitations the ALJ included in the RFC assessment.

A closer examination of the GED reasoning levels further supports the existence of an apparent conflict. The *DOT* specifies that jobs with a GED reasoning level of one require workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *DOT*, 1991 WL 688702 (2016). Jobs with a GED reasoning level of two require workers to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Jobs with a GED reasoning level of three require workers to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in and from standardized situations." The RFC assessment appears to be more consistent with GED reasoning level one than two or three because the abilities to perform simple tasks and to make simple work-related decisions in the RFC assessment are similar to the

provision for applying commonsense understanding to carry out simple instructions at GED reasoning level one. *Compare* Tr. at 30, *with DOT*, 1991 WL 688702 (2016). The need for routine tasks in the RFC assessment is also consistent with the provision for standardized situations at GED reasoning level one. *Compare* Tr. at 30, *with DOT*, 1991 WL 688702 (2016). In contrast, the *DOT*'s descriptions of GED reasoning levels two and three indicate these jobs require more detail and variables than the RFC assessment describes.

In light of the foregoing, the undersigned recommends the court find that an apparent conflict existed between the VE's testimony and the *DOT*'s descriptions of the identified jobs. Because the ALJ failed to recognize or resolve the conflict, substantial evidence does not support her citation of those jobs to meet the Commissioner's burden at step five.

III.   Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 28, 2017                            Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).